Our last argument of today's session, it's Appeal No. 232823, Charles Vavra v. Honeywell International. Mr. Back. Good morning, Your Honors. May it please the Court and Counsel. As you know, this is a retaliation claim under Title VII as well as Illinois state law. My client, Mr. Vavra, who's here, was fired from his job at Honeywell after he refused to go through Honeywell-termed an unconscious bias training program. His complaints about this were in writing. They were numerous. They were very lengthy, and we've reiterated most of them in our briefs. And he said what you would normally think you would get in a complaint of this type. He said, I think this is racist. I think it divides people up into categories. I think it ascribes opinions to people based on the color of their skin, that sort of thing. He actually, at one point on the 24th of March of 2021, said, please consider this to be an official complaint for policy purposes. Honeywell scheduled his termination meeting the next day, and he actually was terminated in a Zoom meeting. The district court held that there was no protected activity. These complaints were not actually protected activity. And also, there's no proof of causation. I'm going to focus on the first issue. I think it's legally more interesting. There are two relevant rules in this circuit, and I think in every circuit as far as I know, regarding what is a protected complaint of discrimination for retaliation purposes. The rule is very clear. You don't have to be right as an employee. You just simply have to have a sincere and reasonable belief that something violates Title VII. How can we say on this record that the belief was reasonable when he never saw the training video? Your Honor, this court has said, look, you don't have to go through the training itself. You don't have to go through the illegal process in order to know. You don't have to see it in order to know what's in it, that sort of thing. Is it your position that all DEI training is discriminatory? Absolutely not. And EEOC, which is amicus in this case, notwithstanding, straight legal compliance training, and I've done probably 500 of them for employers, is absolutely legal, and there's a real public policy reason why that makes sense. What happens is when you get, and I pointed this out before, you get into something called unconscious bias training, that's a little bit different. It draws heavily on the implicit association. Is it your position to conclude that all unconscious bias training is discriminatory in order to find that your client's belief was reasonable? Absolutely. We're not going to, the EEOC says that that's not the case. No, I'm asking you, if in order, one of the elements for the protected activity is that your client's belief had to be reasonable. He admitted that he never saw the video at issue here, so how can we conclude that his belief was reasonable, or even that there was an issue of fact as to its reasonableness when he never saw it? This court's case law on that topic says that, and I'll refer to the Holland case, which is a quote from Holland, it has to be the type of activity that under some circumstances could be covered. In other words, under the circumstances here, and the specifics of the case, is it possible that this training was, in fact, illegal to a certain level? What's the record tell us about the content of the training? Almost nothing, Your Honor, it's very interesting. That's an evidentiary, I mean, I think that's what Judge St. Eve is getting at, I mean, that's a challenge for your client. We asked for it, what we got was a PowerPoint deck file, which had very little in it, and clearly the actual computerized training had more information than that. So what if you got it? What difference does it make if you got it in discovery? You could say in discovery, we got it, and we were right, but how would that prove your when he claimed that he was fired because he wouldn't watch it? Again, referring back to the Holland case, Your Honor, you have to look at all the facts and circumstances to figure out if it's a reasonable belief. Two things here, and this is very clear in Mr. Barbara's deposition, there was an extremely detailed email from John Waldron. Got it, I got that. And Mr. Barbara actually said, look, if that email hadn't come out, I probably just would have taken the training, but based on that email, I knew what they were trying to do. Was there evidence that Mr. Waldron created the video? There's not evidence that anybody created the video, Your Honor, it's been very difficult to figure out the decision-making process. No, no, I mean, he said, okay, so Waldron sent this email, which I found to be offensive and over the top. Because Waldron also created the video, I believed the video would be offensive and over the top. These videos are required, whatever you think about them, okay, sex harassment videos, these are required by employers all over, maybe all over the world. They absolutely are, Your Honor. John Waldron was the boss. Right. He was the guy running the entire division of Honeywell at that time. And this, remember, was after the George Floyd and Breonna Taylor situations, and the information coming out of Corporate America was not simply sex harassment training or something like that. It was saying, this is how you should think about race. And remember, this is an unconscious bias or implicit bias training program, which says if you are Hispanic, you think like this. It's very different from saying- How do you know that's what it says? I don't know that we know that. That's the problem. Exactly. There's nothing in the record that tells us what it says, other than a statement by, I think he watched it, and it involved a white man scenario that was determined discriminatory. Your Honor, I think this gets around to what the standard is if you are complaining about something, which, by the way, is explicitly racial in this case. So this is not like a run-of-the-mill retaliation case. What is explicitly racial? The training program. It is training on- didn't see it. It would be very different if your client had watched it and came in and said, I found it discriminatory for the following reasons. Or similarly, that my hypothesis is correct, that there is a straight line connecting CEO or President John Waldron's email, which your client articulated why he found offensive, and the content of the training that I just watched. They are directly related to one another. Your Honor, I agree if I had the program and the program said that I think all white people suck, if I could use that language here. Okay, that'd be great. We don't have that, and here's the thing. You had, but we're on summary judgment, right? In the district court, you could have said, could you not, to the district court judge, look, I'm representing a client here. I have to be, I have to get more information about this training video, or I'm going to have a major problem. Did you subpoena it? We asked for it in discovery, Your Honor. Yeah, and then when they didn't, she moved to compel, you know, et cetera, et cetera. We took the deposition of the then HR director, Your Honor, and she said that's all there is. There is nothing else. You mean it didn't exist? Nothing else existed, right? Did they turn over the training video to you, and you just didn't watch it? The power, no. There was no training video produced, and in their discovery responses, they said this is all there is. So the training was a PowerPoint, not a video? That's what we got, Your Honor. And you got the PowerPoint? We did. Okay. And under a representation that the training was to click through the PowerPoint, and then at the end say I took the training? Yes, that's what their discovery responses said, Your Honor. And I haven't seen anything that you've submitted that any of those PowerPoint slides were discriminatory. No, we haven't, Your Honor. And they may or may not be. Here's my point, though, and I'd refer the court to the Magar v. St. Joseph medical case. We're not required for purposes of a Title VII retaliation claim to try a case within a case. We don't have to prove that it is, in fact, an illegal discriminatory item in order to support this claim. And here's the thing. There are two rules here. One is you have to show that it's of a type, and that is covered by Title VII. That's the Lord case from this court. But then there's the rule that says you don't have to be right, and that's the Hamner case from this court. Well, I don't know if those rules are in conflict, but there is a certain tension, depending how one takes it. But there's still an objective test that the belief had to be reasonable, and it would be very helpful to support that, since your client didn't see it, to know something about what was in that PowerPoint that made it discriminatory. At the time that Mr. Vavra made this decision to forego the training, he sincerely believed that it was discriminatory, and I don't think since there... I don't doubt that. Yeah. But it also has to be a reasonable belief. The reasonable belief was based on two things at that time. One was the email from John Waldron, and with all respect, Your Honor, I think there is a straight line there, because this was the official policy of Honeywell Integrity, telegrated at the time. And then, when it comes out, it's not simple Title VII training, and Mr. Vavra testified in his deposition that there would be, if it had just been Title VII training, he would have taken it. Why didn't they just do Title VII training? No, it's unconscious bias training, and the court can take judicial notice of the fact, that the implicit association test, which is the exact same thing, is very controversial, and it does make claims that are considered to be out there, very far removed from simple compliance training. Your Honor, it looks like... Okay. Well, we're going to give you a minute on rebuttal. We asked you a lot of questions, and we want to give you your time here. So why don't we pause now, we'll come back to you on rebuttal, we'll hear from Ms. Colby. Thank you. You're welcome. May it please the Court, my name is Jennifer Colvin, and I represent the Defendant Appellee, Honeywell International, Inc. The District Court's opinion should be affirmed. There are no disputed issues of fact in this case. As a plaintiff admitted, all of the facts set forth in the Statement of Facts supporting the motion for summary judgment. As you get started, Ms. Colvin, can you clear up? I sure came into the argument of a mind that I don't know what the training consisted of. I know how it was described. But have you, has your client, did you in discovery produce the training? Yes, the training was produced. The video was produced and Bates labeled as 1308. Is there a video? I'm sorry. No, go ahead. It was a video training, so both the PowerPoint as well as the video had been produced in discovery. The training itself was- How could there be confusion about that? I don't know how there could be confusion about that. It was produced in discovery. Was there ever an argument before the District Court that it was not produced? There was not any argument before the District Court that it was not produced. So can you just spend a second, so it's a, I mean, we've all done this, we've all done these kinds of things. It's a, on the computer, it's a video that is accompanied by a set of facilitating PowerPoint slides and you work your way through them? Correct. It was a, yes, that is correct. It would have been a self-watched video training that could have taken anywhere between 20 to 30 minutes, depending how long it is. And is the video part of it? Is there some kind of narrative? Is there a video? So it contained vignettes or scenarios of situations that might involve unconscious bias. The record does reflect that one of those scenarios involved a unconscious bias against a white man because the holder of the bias believed that a woman would be better suited for the job task. So those were the types of scenarios that were being shown in this video. And if we had, if the panel here had the discovery record, we could go to that Bates number, we could watch the video, and we could watch it with the PowerPoint, accompanying PowerPoint slides in our hands, is what you're saying? Yes, I believe that to be. And that was produced in Discovery? It was. All right. So at the end of the day, when you look at this record as a whole, it does not support that a reasonable jury would find that Mr. Vavra was terminated for engaging in protected activity. Was Mr. Vavra ever warned that he could be terminated for not completing the training? Yes. That started as early as when the training actually was announced in November of 2020. Was there an explicit warning? I know it was said it was mandatory, but was there any kind of explicit warning that mandatory means if you don't take it, you're going to be fired? Yes. When he met with Chris Maines, who was the vice president of engineering, after he had raised his complaint, Mr. Maines did tell him that it would be insubordination. That was quite a bit later, correct? That would have been after he made his complaint. Up until the time that he made his complaint on March 8th, it appeared that, like many employees, he simply just hadn't gotten around to taking it, right? He had received... And he was given... He had a couple of opportunities, even it seemed, I mean, maybe I'm misreading it, you can correct me if I'm wrong, but even after the stated deadline had come and gone, a couple of his colleagues or managers or something came to him and said, hey, look, are you going to draw a line in the sand on this or take that training? Yes, that's absolutely correct. On the 2nd of March, he was told that he needed to take the training, that it was mandatory. After the deadline? That was after the deadline. The deadline was February 25th. He received a daily automated email after the 25th that told him how many days he was out of compliance, that the training was required, and that the matter had been escalated to his manager. His manager then indeed did speak with him about taking it and told him that he needed to complete it within the next 24 hours. HR followed up with him to remind him that it was mandatory training. And indeed, on the 5th of March, HR reached out to him and again reminded him that this was mandatory training for all employees and asked him if he had any barriers to completing the training. Only then did he raise his complaint about John Waldron's email and the training itself. But the record reflects that Honeywell never stopped trying to get him to take this training. Even after he made his complaints, he continued to receive the daily automated emails. Mr. Maines met with him, and then when they met with him on the day of his termination, before he went into the meeting, Jeff Cortes, his direct manager, asked him if he was sure that he wasn't going to take the training. And in that meeting, he was explicitly given the option to take the training and was told that if he would not take the training, that he would be terminated. Mr. Barbara understood the seriousness of that because he left the Zoom, said he needed to speak with his wife, came back, said he was not going to take the training, and indeed, he was told he was being terminated because he did not take the training. It seems from the record that he was otherwise a good employee. Is that a fair statement? I think that is a fair statement. Yeah, in fact, it seems to me that they were urging him to take it and stay with the firm, stay with the company. I think that's a fair interpretation, that they wanted him to take it. It was required of all their employees. They wanted him to take it. They wanted to keep him employed in that regard. But he continued his refusal. If I could address the argument with respect to his refusal to take the training, itself being protected activity, as the court noted, it's not just a subjective belief that's needed. It's an objectively reasonable belief that is needed. And here, he did not have that objective, reasonable belief. He simply couldn't have. First, when you look at the record, as you noted, he did not take the training. But even when the training was announced in November of 2020, that training stated that it was being launched as part of the company's commitment to diversity and inclusion. It stated, quote, while it's human nature to have biases, we must strive to overcome them to create an environment that values everyone's perspectives, close quote. No reasonable person could have read that missive and determined that, as Mr. Bavra did, that John Waldron's email, combined with the training, was going to vilify an entire class of people being white people. And when his continued refusal, after he complained, that could not be objectively reasonable once he spoke to his manager, Jeff Cortez. Again, Mr. Cortez spoke with him and said, I've taken the training. I don't think it is racist. And it includes a scenario where a white man was the victim of unconscious bias and that the holder believed a woman was more appropriate for the position. Once he had that information, he could no longer objectively believe that the training was meant to vilify an entire class of people. If there are no further questions from the panel, I would ask that the panel affirm the decision of the district court. Very well. Ms. Colvin, Mr. Back. Thank you, Your Honor. Two very quick points. First, about the warning about termination. The first mention of it was on March 19th of 2021. The termination decision was made six days after that when the Zoom meeting was scheduled. This was the day after he made the official report, said to consider this official report. With regard to the objective belief about the discriminatory nature of the training, we need to look at the time that Mr. Bavra made his decision. Again, because under the Mygar case, we don't go back and try the case and say, hey, as it turns out, it's not discriminatory. What he knew at the time was based on John Waldron's extensive email and the implicit bias aspects of the training itself, which go far beyond simple legal compliance. So we would ask that the case be reversed and remanded back to the district court. Thank you. Okay. Very well. Mr. Back, thanks to you and your colleague. Ms. Colvin, thanks to you and your colleagues. We'll take the appeal under advisement. And that concludes today's arguments.